Jardim, Meisner & Susser, PC
30B Vreeland Road, Suite 201
Florham Park, New Jersey 07932
973.845.7640
Attorneys for Plaintiff
 Lou Ann Woerner

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOU ANN WOERNER as the beneficiary of Michael J. Woerner,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>FRAM GROUP OPERATIONS, LLC and THAT CERTAIN EMPLOYEE WELFARE BENEFIT PLAN SPONSORED BY FRAM GROUP OPERATIONS, LLC,<br><br>Defendants. | Civil Action No: 2:12-CV-6648 (SRC)<br><br><br>**FIRST AMENDED COMPLAINT** |

Lou Ann Woerner ("Plantiff"), the beneficiary of her deceased husband, Michael J. Woerner ("Michael"), by and through her undersigned counsel, and by way of this First Amended Complaint against FRAM Group Operations, LLC ("FRAM") and That Certain Employee Welfare Benefit Plan Sponsored by FRAM Group Operations, LLC, alleges as follows:

## SUMMARY OF ACTION

1.      Plaintiff brings this Complaint for life insurance benefits under an "employee welfare benefit plan" (the "Plan") established and sponsored by FRAM. The Plan was in written form and presented to Plaintiff and Michael <u>prior to the date of Michael's death in February 2012</u> (i.e., the date upon which Plaintiff became vested in the life insurance benefits under the Plan). Subsequent to the date of Michael's death, FRAM further memorialized the Plan into a new "plan document" and, in doing so, named or re-named the Plan the FRAM Group Operations, LLC Group Benefits Plan. The Plan is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001. Plaintiff seeks an award of life insurance benefits under the Plan.

## THE PARTIES

2.      Plaintiff is an individual residing in Morristown, New Jersey.

3.      Plaintiff is the surviving spouse of Michael J. Woerner ("Michael"), a deceased individual formerly residing in Morristown, New Jersey. Michael was an employee of Honeywell International Inc. ("Honeywell"). After Honeywell sold the business unit in which Michael was employed to FRAM, Michael became an employee of FRAM and a participant in FRAM's employee benefits plans.

4.     Defendant FRAM is the plan sponsor and plan administrator of the Plan. Defendant FRAM is also the "employer" of the participants of the Plan, including Michael, and makes contributions to the Plan.

5.     Non-party, Eric Schueneman ("Schueneman") is an individual who, during all relevant times, was and is Defendant FRAM's "Director of Compensation, Benefits and HRIS."  At all relevant times Schueneman served as an agent of FRAM and all of his actions described in this Amended Complaint are attributable to FRAM.

6.     FRAM is a "fiduciary" of the Plan within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21).

7.     The Plan is an "employee welfare benefit plan" within the meaning of, and subject to, ERISA.

## JURISDICTION AND VENUE

8.     Plaintiff asserts concurrent federal jurisdiction pursuant to § 502(e) of ERISA, 29 U.S.C. § 1132(e), and 28 U.S.C. § 1331.

9.     Venue is proper in the District of New Jersey pursuant to § 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), and pursuant to 28 U.S.C. § 1391(a), because the Plan and the Plan's sponsor reside in this District and further because a substantial part of the events and omissions giving rise to the claims brought herein occurred in this District.

## EXHAUSTION OF REMEDIES

10.     Exhaustion of Plan remedies, if and to the extent applicable under law, is not required because the Plan document, as in effect at all relevant time periods, did not contain a requirement or provision relating to administrative remedies.

11.     Exhaustion of Plan remedies is futile.

12.     FRAM violated ERISA and the terms of the Plan by requiring Plaintiff to seek benefits under the Plan through an administrative procedure, because the Plan does not have an administrative procedure.

## FACTUAL ALLEGATIONS

13.     On or about late July of 2010, Michael was diagnosed with brain cancer.

14.     On or about January 27, 2011, Honeywell and Defendant FRAM agreed to enter into a transaction pursuant to which, at some future date, Defendant FRAM would acquire from Honeywell one of Honeywell's business units. Michael was employed and performed services specifically for that business unit. The proposed sale was publicly disclosed in filings with the U.S. Securities and Exchange Commission.  Michael, as well as all other employees of the business unit in question, became aware that, upon the closing of the sale, they would become employees of Defendant FRAM, or an affiliate of Defendant FRAM.

15.    Even the most-healthy of employees of Honeywell's to-be-acquired business unit began to consider whether the upcoming transfer of their employment would have a negative impact on employee benefits, such as medical, disability and life insurance.  In this regard, it is not hard to imagine the concerns that an employee with brain cancer, and that employee's spouse, might have been considering at this time.

16.    On or about June 24, 2011, as a result of his cancer, Michael commenced a disability leave from work and was paid "short term disability" benefits.

17.    On about July 29, 2011, Honeywell and FRAM closed the sale of the business unit and, as of such date, Michael became an employee of FRAM or its affiliate (the "Business Sale").

18.    Michael and Plaintiff became very concerned about whether the Business Sale would have any adverse effect on Michael's employee benefits and insurance coverages.   In this regard, Plaintiff actively, and with remarkable tenacity, commenced to seek information from Defendants.  Defendants possess and must preserve telephone and email records and personnel files memorializing this tenacity.

19.    Plaintiff tried to obtain this information from numerous sources, and from various personnel of both Honeywell and Defendant FRAM.   For a long

period of time, it seemed that no one could, or would, provide Plaintiff this information.

20.    Plaintiff soon learned that it would be necessary to obtain that information from Schueneman because he was Defendant FRAM's "Director of Compensation, Benefits and HRIS."

21.    Following the Business Sale, seeking information about the Plan, Plaintiff made several attempts to reach Schueneman at his business office, but he infrequently answered his phone, and never returned any voice mail messages.  If contact was made with anyone during this time, no information was provided because "it was not yet available."

22.    Following the Business Sale, seeking information about the Plan, Plaintiff wrote several messages to Schueneman by electronic mail, but he never responded.

23.    Finally, and with great relief on the part of Plaintiff, on October 21, 2011, Michael received an email from Defendant FRAM titled "Message from FRAM Group HR - Benefits update for FRAM Group Employees."  This email listed a number of benefit programs, including Supplemental Life Insurance.  The email stated "Once you receive and review the benefits details, you may elect the plan of your choosing."  The email also stated that "these benefits are designed for you to have access to the coverage you need in the case of an illness or other

medical condition."   A true and correct copy of the October 21, 2011 e-mail is attached hereto as **Exhibit A.**

24.    On October 28, 2011, FRAM sent an e-mail to FRAM employees, including Michael, providing additional information about benefit options, including voluntary life insurance.   A true and correct copy of the October 28, 2011 e-mail is attached hereto as **Exhibit B**.

25.    On or about November 8, 2011, a telephone conference occurred with Plaintiff, Michael, Schueneman, and a Honeywell Human Resources employee named Sharmela in which medical benefits and the transition of medical care to BCBS were discussed.   During the telephone conference, Michael asked what his job would be when he came back to work.   He wanted to work and was eager to know what he would be involved with at Defendant FRAM.   Schueneman stated, in substance, "We would have to wait until that time comes."   Michael followed up with emails on November 10th and again on November 14th asking Schueneman to confirm the meeting notes.   FRAM finally responded on November 18, 2011.

26.    On November 18, 2011, Michael also received another message from Defendant FRAM titled "Message from FRAM Group HR - Benefits Update for FRAM Group Employees" which provided more detail on plan types and enrollment dates.

27. During late November 2011, Plaintiff seemed to at long last receive the information she was desperately seeking – in the form of a material communication relating to Defendant FRAM's employee benefit plans' open enrollment materials and election forms.

28. These "open enrollment" forms applied to employee benefits for calendar year 2012 – so that Michael could choose the particular medical, disability and welfare benefits and insurances that he desired for himself and his beneficiaries (the "Open Enrollment Materials").

29. On December 2, 2011, Michael sent Schueneman an email asking how to get into the system to enroll for 2012 benefits. Michael and Plaintiff knew it was important to begin the enrollment process, but they had not yet received any communication on how to access the online website. On December 5th, 5 days after the open enrollment period began, Schueneman sent Michael a copy of a letter titled "Welcome to your 2012 FRAM Group Benefits Open Enrollment" which detailed how to access the system and enroll. The letter stated that the enrollment period was November 30th through December 12th. A true and correct copy of the December 5, 2011 letter is attached hereto as **Exhibit C**.

30. As soon as Plaintiff had access to the enrollment forms online, she saw that there was a line item for Basic Life, 1.5 x salary and it indicated that

Michael was enrolled. Plaintiff was so thrilled, that she called Schueneman by telephone. During this conversation, Plaintiff asked Schueneman, in substance:

> **"Will my husband have basic life insurance coverage at FRAM?"**

Schueneman responded, unequivocally:

**"Yes."**

Plaintiff then asked: **"Are you sure?"**

Schueneman responded, unequivocally: **"Yes" (the "Promise").**

31.　Michael and Plaintiff worked together to choose their benefits and insurance coverages for 2012, and then "enrolled" in the Plan and "purchased" such benefits coverages and insurances by completing and executing the open enrollment forms and contracts.

32.　Those open enrollment forms and contracts were processed by Defendant FRAM's "HRIS" systems. Schueneman is the "Director" of Defendant FRAM's "HRIS" systems.

33.　Those open enrollment forms and contracts were made, executed and processed, and became binding, on December 7, 2011, at 12:26PM. At that time, Defendant FRAM and Schueneman both knew, or should have known, that Michael and Plaintiff had elected benefits under the Plan and "purchased" life insurance coverages under the Plan, effective January 1, 2012.

34.     As a direct result of such elections, Michael and Plaintiff received confirmation that such elections and purchases were accepted by the Plan, and by FRAM, through the provision of confirmation materials (the "Confirmation of Coverage Materials"), a true and correct copy of which are attached hereto as **Exhibit D**.   Those Confirmation of Coverage Materials clearly provide and memorialize the following life insurance purchase transactions and federal common law of ERISA contracts:

> BASIC LIFE INSURANCE
> EFFECTIVE DATE:  JANUARY 1, 2012
> BENEFICIARY:  LOU ANN WOERNER
> COVERAGE AMOUNT:  $297,000
> **STATUS:  ENROLLED**
> VOLUNTARY LIFE INSURANCE
> EFFECTIVE DATE:  JANUARY 1, 2012
> BENEFICIARY:  LOU ANN WOERNER
> COVERAGE AMOUNT:  $198,000
> COST:  $16.91 (per month)
> **STATUS:  ELECTED**

(emphasis added).

35.     Another "Benefits Enrollment" page listed Lou Ann as the 100% beneficiary of Michael's insurance enrollments.

36.     Those elections were valid and effective.  Further evidence that these insurance transactions were effective is that Michael and Plaintiff also elected

medical insurance through the Plan, and that insurance was provided and became effective as of January 1, 2012.

37.     On December 8, 2011, one day after executing the open enrollment elections and electing insurance coverage, Michael and Plaintiff had several questions about the benefits that they just elected.   For example, they asked Schueneman questions about the voluntary life insurance guaranteed coverage of $350,000 (the maximum amount guaranteed to all employees without requiring evidence of insurability).   They wanted to know how to sign up for the full amount. The enrollment form required the amount to be a multiple of salary, and two times the Plaintiff's salary would exceed the $350,000 guaranteed amount.   They only signed up for one time his salary ($198,000) and submitted it knowing that they could change this amount before December 12, 2011.   They also asked for a Summary Plan Description.

38.     FRAM never got back to Plaintiff or Michael.   Defendants failed to provide Plaintiff and Michael with a copy of the Summary Plan Description prior to the date of Michael's death.

39.     Michael was a participant of the Plan, within the meaning of ERISA and within the meaning of the Plan, as of January 1, 2012.   Plaintiff was a beneficiary of the Plan, within the meaning of ERISA and within the meaning of

the Plan. And Plaintiff was during these times a beneficiary of the Plan, within the meaning of ERISA and within the meaning of the Plan.

40.   Effective January 1, 2012, Michael's beneficiary, Plaintiff, was covered by Basic Life Insurance and Voluntary Life Insurance in the amounts described above, and entitled to life insurance benefits under the Plan upon Michael's death.

41.   Pursuant to the Promise, Michael and Plaintiff were promised life insurance benefits under the Plan, effective January 1, 2012.

42.   Michael and Plaintiff relied upon the Promise.

43.   It was reasonable for Michael and Plaintiff to rely upon the Promise because the Promise was documented, memorialized, and set forth in the Plan's open enrollment process, and Michael and Plaintiff actually received written confirmation that the Basic Life Insurance coverage and Voluntary Life Insurance coverage were effective and in place for the benefit of Michael and Plaintiff through the Confirmation of Coverage Materials. Even more so, such reliance was reasonable because, on January 1, 2012, the medical benefits that Michael and Plaintiff elected became effective.

44.   In December of 2011 and January of 2012, Schueneman and FRAM continued to mostly ignore Plaintiff's subsequent communications, including

written communications to his business email account hosted by Defendant FRAM.

45.     During January 2012, Michael and Plaintiff realized that premium contributions for benefits (such as for Voluntary Life Insurance) were not deducted from any of Michael's compensation (which he was not receiving) or disability checks, and that no other communication relating to the payment of premium contributions had been issued to them from Defendants.   For example, the Voluntary Life Insurance required a monthly premium contribution of $16.91, and they were not sure whether the monthly payments would be deducted out of Michael's monthly disability checks, or whether Michael would need to mail in a check every month.   So Plaintiff sought information from Defendant FRAM, via Schueneman, about these premium payment obligations and issues, and also other issues.   Plaintiff never received a response to her requests for information.

46.     It should be noted that Michael and Plaintiff did not expect any such communication in respect of the Basic Life Insurance, because the entire cost of that coverage was to be paid by Defendant FRAM, and therefore no employee co-payment or premium was required or applicable.

47.     Nevertheless, Michael and Plaintiff grew concerned over the possibility of some type of administrative error on the part of Defendants that might, at the very least, cause stress and bureaucratic nightmares, and at the very

worst could impair the benefits and insurance coverages. Defendants' continued silence was concerning (and a violation of ERISA).

48.    Plaintiff continued to attempt to reach Defendant FRAM via Schueneman. Finally, in or about mid to late January of 2012, Plaintiff did reach Schueneman by telephone and she explained to him that she had not been provided any communication relating to the payment of premium costs for benefits (including Voluntary Life Insurance benefits).

49.    Schueneman responded to her, in substance:

> **"Don't worry, we are just putting those letters together now and they will explain how to pay by check. You are covered."**
> **(the "Promised Letter").**

50.    Plaintiff clearly recalls that conversation. One reason that she recalls that conversation so well is that she discussed the substance of it with Michael, and she recalls that, on the date of that call, and for a few days immediately before and after, Michael was doing very well from a medical and mental standpoint. Michael was of clear mind, and focused, and he even discussed with Plaintiff that Michael wanted to contact his supervisor and have a discussion about work issues and making accommodations for him to return to work. Plaintiff clearly recalls this conversation with Michael because Michael was previously granted permission by Honeywell to set up, and work from, a "home" office, and Plaintiff recalls

discussing with Michael the details of Michael returning to work but working from the home office.  Further, Plaintiff recalls that, during January of 2012, Michael was lucid, sharp, and thinking about "logistics" on behalf of his employer.  He could have, and would have, attended work for at least a few days if he had the information about the Plan that he and Plaintiff were so desperately seeking, and but for Defendant FRAM's failure to inform him of an "actively at work" requirement for obtaining life insurance.

51.    The Promised Letter never came.

52.    The promise of the Promised Letter that would explain "how to pay by check" was a material misrepresentation, and was possibly fraudulent.

53.    The Promise was a material misrepresentation.

54.    Michael and Plaintiff reasonably relied on these material misrepresentations, to their detriment.

55.    Michael and Plaintiff relied upon the Promise to their material detriment.

56.    Defendants, and their insurers, withheld critical information about the Plan from Michael and Plaintiff until such time as Michael was already dead from brain cancer.

57.    If FRAM had disclosed the critical information about the Plan – that Michael was required to attend work for one day on or after January 1, 2012 in

order to become eligible for life insurance benefits under the Plan – he could have,
and would have, done so.[1]

58.    Michael passed away on February 24, 2012.

59.    On March 6, 2012, Plaintiff and Schueneman had a telephone
conversation regarding benefits under the Plan in which, yet again, Schueneman
indicated to Plaintiff that he still had to "work on it."    Plaintiff recalls that
conversation very well because she remembers feeling that it was "cold comfort."

60.    As of Michael's death on February 24, 2012, no document,
instrument, or writing containing an 'actively at work' requirement had been
delivered or transmitted to Plaintiff or Michael.

61.    Schueneman first gained knowledge and information indicating that it
might be necessary for Michael to attend work for a day in order to become

---

[1] "[A] fiduciary has a legal duty to disclose to the beneficiary only those material facts, known to
the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own
protection." Horn v. Cendant Operations, Inc., 69 Fed. Appx. 421, 427 (10th Cir. July 3, 2003)
(unpublished) (quoting Glaziers & Glassworkers Union Local No. 252 Annuity Fund v.
Newbridge Sec., Inc., 93 F.3d 1171, 1182 (3d Cir. 1996)). "[T]o make out a breach of fiduciary
duty claim [under ERISA], a plaintiff must establish each of the following elements: (1) the
defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the
part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance
by the plaintiff on the misrepresentation." Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3d
Cir. 2001); see Owen v. Regence Bluecross Blueshield of Utah, 388 F.Supp.2d 1318, 1333 (D.
Utah 2005) (applying the test from Daniels) (citing Burstein v. Ret. Account Plan for Employees
of Allegheny Health Educ. & Research Found., 334 F.3d 365, 384 (3d Cir. 2003) (adhering to
the Daniels test)). And thus, a "fiduciary's misrepresentation or failure to disclose is material 'if
there is a substantial likelihood that it would mislead a reasonable employee in making an
adequately informed . . . decision.'" Horn, 69 Fed. Appx. at 427 (quoting Jordan v. Fed. Express
Corp., 116 F.3d 1005, 1015 (3d Cir. 1997) (alteration in original).

eligible for life insurance benefits under the Plan on March 6, 2012, after Michael's death.

62.    FRAM first received a draft and final version of the FRAM Plan containing an "actively at work" requirement on March 16, 2012, after Michael's death.

63.    In March 2012, Schueneman gained knowledge and information indicating that he made material misrepresentations to Plaintiff with regard to the Promise and about the Promised Letter.

64.    Still devastated by her husband's death, and frustrated, anxious and furious as a result of Defendants' inhumane treatment of her, on April 9, 2012, Plaintiff sent an email to Schueneman at his business email account hosted by Defendant FRAM stating:

> **Eric,**
>
> **It has been over a month since my husband's passing and telephone conversation with you regarding life insurance benefits.  When will I be contacted on the payout of this benefit?  Every time I call you have indicated that it would be just a few more days before you can update me.  Can you please tell me when I will be contacted.**

Schueneman did not respond to this email.

65.    Plaintiff never received any life insurance benefits from the Plan. Instead, FRAM forced Plaintiff to deal with the insurance company directly and alone, knowing full well that the insurance company was not going to make any

payments, because they told Schueneman so.  Schueneman completely ignored the

fact that FRAM and/or the Plan remain obligated to pay those benefits whether the

benefits were insured or not insured.  And Schueneman completely ignored the fact

that he, acting on behalf of FRAM, had personally promised those benefits, and

that he was the central and sole responsible individual for this despicable mess.

Stated another way, Defendants are obligated to assure life insurance under the

Plan for Michael and for the benefit of Plaintiff by virtue of their promises.

66.    Soon after Plaintiff received the shocking news that the Defendants

breached the Promise, and violated ERISA, and forced her to deal with the

insurance company alone (while knowing full well that this avenue would be

futile), Plaintiff became aware that the Plan was never memorialized into a writing,

and that no "plan document" even existed.

67.    However, Section 402 of ERISA, 29 U.S.C. § 1102 requires that

ERISA plans, such as the Plan, be memorialized in writing so as to protect

participants and beneficiaries, and to avoid the exact type of situation pleaded

herein.  How can an employer administer and operate an ERISA plan if there are

no benefit eligibility provisions?

68.    After a purported denial of her life insurance benefits under the Plan,

on August 12, 2012, Plaintiff requested from the Plan's "plan administrator" (in

accordance with Section 104(b)(4) of ERISA) a copy of the "plan document" for

the Plan.  By cover letter dated September 10, 2012, Schueneman sent Plaintiff a copy of the Plan document – **however that Plan document, although purportedly "effective" January 1, 2012, was not memorialized in writing, approved or adopted until September 10, 2012 – well after the death of Michael and even after the date upon which Plaintiff requested a copy.**

69.    The Plan document was never adopted until well after the Plan came into purported existence, after the Promise, after the death of Michael, and after Plaintiff was denied benefits.  In fact, the Plan document was not adopted until after Plaintiff asked for a copy.

70.    **DEFENDANTS (THROUGH THEIR INSURER) DENIED PLAINTIFF LIFE INSURANCE BENEFITS UNDER THE PLAN EVEN THOUGH THERE WAS NOT ANY PROVISION IN THE APPLICABLE PLAN DOCUMENT WHATSOEVER AUTHORIZING SUCH DENIAL.**

71.    Defendants denied Plaintiff life insurance benefits by reason of failure to meet the "active at work" requirement under the Plan.  However, the plan document of the Plan, as in effect as of the date of Michael's death, did not contain an "active at work" requirement.

72.    To the extent that Defendants denied Plaintiff life insurance under the Plan for other reasons relating to the terms of the Plan, such denial was also based

upon a plan document of the Plan, or plan provisions or rules, that were not in effect as of the applicable dates.

73.     As a matter of law, under ERISA, Defendants cannot impose a provision of the Plan to deny benefits to Plaintiff that was adopted after the death of Michael.

74.     Defendants' denial of Plaintiff's benefits under the Plan was unlawful, arbitrary and capricious.

75.     As a matter of law, under ERISA, the "plan document" of the Plan, within the meaning of ERISA may only be comprised as those document that were in existence, and communicated to Plan participants, as of the date of Michael's death, or prior (the "Effective Plan Document").

76.     The Effective Plan Document with regard to Plaintiff's claims is comprised of (i) the Open Enrollment Materials and (ii) the Confirmation of Coverage Materials.  The documents comprising the Effective Plan Document are attached hereto as **Exhibits A** through **D.**

77.     Defendants violated ERISA and the Plan by not following the Effective Plan Document with respect to Plaintiff's claim for benefits under the Plan.

## FIRST COUNT
## CLAIM FOR BENEFITS UNDER THE PLAN
## PURSUANT TO SECTION 502(a)(1)(B) of ERISA

78.     Plaintiff repeats and reasserts the allegations set forth above as if fully set forth herein.

79.     Plaintiff is entitled to life insurance benefits under the Plan.

80.     Defendants denied such benefits in violation of the terms of the Plan.

81.     The Effective Plan Document was the operative plan document of the Plan at the time of, and in connection with, Michael's death and Plaintiff's right to life insurance benefits under the Plan.

82.     Defendants disregarded the Effective Plan Document in denying Plaintiff's claim for benefits and, instead, relied upon a plan document of the Plan that did not exist at the time of Michael's death.

83.     Plaintiff is entitled to life insurance benefits under the Plan, as pleaded herein, and Defendants' denial of the same was unlawful, violative of the Plan, and arbitrary and capricious.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands that the Court enter judgment against Defendants as follows:

(1)    Award Plaintiff life insurance benefits under the Plan in accordance with the Effective Plan Document;

(2)    Order that Defendants pay Plaintiff's reasonable attorneys' fees and costs of this action pursuant to the provisions of § 502(g) of ERISA, 29 U.S.C. § 1132(g); and

(3)    Such other and further equitable relief as the Court deems just and proper.

Respectfully submitted,

**JARDIM, MEISNER & SUSSER, PC**
Attorneys for Plaintiff

By:    *s/ Richard S. Meisner*
Richard S. Meisner

Dated:  September 4, 2014