NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LOU ANN WOERNER, as the beneficiary of Michael J. Woerner, | : | **Civil Action No. 12-6648 (SRC)** |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| FRAM GROUP OPERATIONS, LLC, and THAT CERTAIN EMPLOYEE WELFARE BENEFIT PLAN SPONSORED BY FRAM GROUP OPERATIONS, LLC, | : | |
| | : | |
| Defendants. | : | |

**CHESLER**, District Judge

This matter comes before the Court upon the cross-motions for summary judgment filed by Plaintiff Lou Ann Woerner ("Plaintiff" or "Mrs. Woerner") and Defendant FRAM Group Operations, LLC ("Defendant" or "FRAM"). The Court has considered the parties' written submissions and oral arguments. For the reasons that follow, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's cross-motion for summary judgment. The Court will dismiss as moot Defendant's motions to strike and compel joinder.

## I.   BACKGROUND

### A.  Facts

In this case, a widow seeks to collect $495,000 in benefits pursuant to her late husband's life insurance ERISA plan. The parties in this matter agree to the following facts.

Plaintiff Mrs. Woerner was married to the late Michael Woerner ("Mr. Woerner"), an employee of the Consumer Products Group at Honeywell International, Inc. ("Honeywell").

1

Doctors diagnosed Mr. Woerner with brain cancer in 2010. On June 24, 2011, Mr. Woerner commenced a sick-leave from work.

On July 29, 2011, Honeywell sold its Consumer Products Group to the UCI-FRAM Group ("UCI-FRAM"), a business entity comprised of numerous automobile-part suppliers, including Defendant FRAM. After the sale, Mr. Woerner became an employee of UCI-FRAM, though he remained on sick leave.

In August of 2011, UCI-FRAM began to establish its employee benefit plans; this task was primarily handled by UCI-FRAM's Director of Compensation & Benefits, Eric Schueneman ("Mr. Schueneman"). UCI-FRAM selected CIGNA Group Insurance ("CIGNA") as the provider for its FRAM Life Insurance Plan. UCI-FRAM made this selection with the understanding that CIGNA would require employees to be engaged in active service in order to be eligible for life-insurance coverage. After signing on, CIGNA became responsible for creating the FRAM Life Insurance Plan and deciding whether to grant claims for benefits.

On October 21, 2011, Defendant FRAM emailed its employees, including Mr. Woerner, a message entitled, "Benefits Update for FRAM Group Employees." [Docket Entry 65, Document 6]. The message relayed the following: "We are [] pleased to announce our new employee benefit vendors, and in the coming weeks all new plan options and details will be communicated to you." The message reported that "new benefits will include . . . Supplemental Term Life Insurance" and that CIGNA would manage such coverage. The message also stated that open-enrollment would run from November 28, 2011 until December 9, 2011, and it informed employees, "Once you receive and review the benefits details, you may elect the plan of your choosing."

On October 25, 2011, Mr. Schueneman met with CIGNA representatives to discuss the implementation of the FRAM Life Insurance Plan.  In anticipation of that gathering, on October 24th, a CIGNA representative emailed Mr. Schueneman a meeting agenda.  [Docket Entry 76, Page 91].  The email contained attachments, including a file entitled, "FRAM Plan Rate and Rate Confirmation.doc."  [Id. at 94].  That document appears to define "Class 1" of those eligible for the Voluntary Term Life Insurance Plan as "Active" employees who were "regularly working a minimum of 20 hours per week."  [Id. at 101].  However, FRAM did not distribute this email or its attachments to Mr. or Mrs. Woerner.  Indeed, that attachment expressly provides that it was not final nor meant for distribution:

> This document is neither an insurance contract nor an agreement for administrative insurance services.  You will receive a contract of insurance, plan documents, and/or service agreement that describes the final benefit and service selections agreed by you and CIGNA Group Insurance.  This is a working document that is used to finalize and capture plan design details for the purpose of creating the policies/agreement for your coverages.  This is not for distribution to Employees.

[Id. at 100].

Another attachment to that email was entitled, "Term Life Insurance Change Form" [Id. at 97], which provided a space for employees to certify to the following:  "I understand that my insurance will not go into effect unless I am actively at work on the effective date."  [Id. at 99].  FRAM does not contend that Mr. Woerner received or completed this certification.

At around the same time as the October 25, 2011 meeting, UCI-FRAM and CIGNA agreed to a schedule under which CIGNA was to give FRAM the final documents for the FRAM Life Insurance Plan, including the "Policy, Agreements, and Certificates," by about the week of January 2, 2012.  [Id. at 135].  The "policy" document referred to a formal plan document, and

"certificates" referred to a summary plan description or "SPD."  FRAM never ultimately

provided such documents to Mr. or Mrs. Woerner.

On October 28, 2011, FRAM again emailed its employees, including Mr. Woerner, a

"Benefits Update."  [Docket Entry 65, Document 7].   The update provided a "brief overview of

each plan."  With respect to voluntary life insurance, the message identified CIGNA as the

carrier, and it reported that the cost of insurance was based on the employee's age and amount of

coverage selected; it does not mention a requirement that the employee be actively at work.

On November 3, 2011, Mr. Schueneman emailed a CIGNA employee as well as an

employee of the company that UCI-FRAM had hired to help it with plan enrollment, Ceridian.

In the email, Schueneman attached a benefits grid that outlined the benefits of various plans.  [Id.

at 246].  With respect to basic life insurance, the grid appears to assert that to be eligible,

employees "[m]ust be actively at work."  [Page 247].  FRAM did not provide the Woerners with

a copy of this document.

On November 4th, FRAM again emailed its employees, including Mr. Woerner, to

answer employees' frequently asked questions.  [Docket Entry 65, Document 8].  The message

asserts:  that employees would receive enrollment information over "the coming weeks"; that

enrollment would run from November 28 until December 9; that any prior Honeywell benefits

would end on December 31, and notably, that new coverage would begin on January 1, 2012.

On December 2, Mr. Woerner emailed FRAM officials to ask, "Will I get an email with a

link to sign up for coverage or will it come hard copy in the mail?"  [Id., Document 9].  Mr.

Woerner copied his wife on the message.  On December 5, Schueneman responded by attaching

a letter containing enrollment instructions.  The letter has the heading, "Welcome to your 2012

FRAM Group Benefits Open Enrollment!"  It details how to enroll online, and states that any

elections made during the enrollment period "will be effective January 1, 2012."

Mr. Woerner completed and submitted enrollment forms within the enrollment period.

These forms were then processed by FRAM's third-party administrator.  On December 7,

Ceridian sent Mr. Woerner an automatically generated "Confirmation for Employee Open

Enrollment," which listed Mr. Woerner's benefit elections.  [Id., Document 10].  The letter

states, in part, "Your coverage . . . as reflected in this Confirmation Statement, will remain in

force during 2012."  The document summarized Mr. Woerner's "Benefit enrollment

information" as being "enrolled" in "Basic Employee Life/AD&D Insurance," and as having

"elected" the "Voluntary Employee Life/AD&D Insurance," both of which were described as

beginning on January 1, 2012.  By the time the enrollment period ended, FRAM had not

provided enrollees with formal, final documents setting forth the terms of its benefits plans.

On December 8, Mrs. Woerner emailed Mr. Schueneman to ask him about Mr.

Woerner's coverage, and she copied another FRAM official as well as Mr. Woerner.  [Id.,

Document 4].  With respect to voluntary life coverage, Mrs. Woerner said that Mr. Woerner

wanted to purchase the $350,000 guaranteed coverage option, and she asked how he could do so.

Mrs. Woerner also asked, "Could you please email me a copy of the 2012 Summary Plan

Description?"  Despite the request, FRAM never provided a SPD to the Woerners.

Mr. Woerner passed away from brain cancer on February 24, 2012.  As of that date, "no

document, instrument, or writing containing [an] 'actively at work' requirement had been

delivered or transmitted to [Mrs. Woerner] or Mr. Woerner."  [Id., Document 17, Page 5].

FRAM acknowledges that before that date, it never informed Mr. Woerner that he was not

eligible for his enrolled plan, nor that Mrs. Woerner was not a registered beneficiary.

On March 6, 2012, Mrs. Woerner wrote to Mr. Schueneman:

> Per our telephone discussion today, 3/6/12, I will expect a phone call
> from you sometime in the next week regarding my husband, Mike's,
> 2012 benefits enrollment for basic life and supplemental life
> [insurance] with Fram . . . . Mike signed up for . . . life [insurance]
> during the open enrollment period and the print out of the enrollment
> options he chose indicates he was enrolled in basic life and
> supplemental at 1 x salary[.] We had every expectation that we were
> covered for all these benefits and you and I specifically had a
> conversation during the enrollment period in which you confirmed
> that Mike would indeed be covered for basic life.

[Id., Document 13].

On March 16, 2012, CIGNA gave UCI-FRAM the official FRAM Life Insurance Plan

documents, including a complete, written version of the ERISA plan.  This was the first time

FRAM received final documents for its plan; the delivery was three weeks after Mr. Woerner

died and over three months after CIGNA was scheduled to give the documents to FRAM.

On April 9, Mrs. Woerner followed up with Mr. Schueneman:

> It has been over a month since my husband's passing and telephone
> conversation with you regarding life insurance benefits. When will
> I be contacted on the payout of this benefit? Every time I call you
> have indicated that it would be just a few more days before you can
> update me. Can you please tell me when I will be contacted?

[Id., Document 13].

On April 25, Mr. Schueneman sent Mrs. Woerner a copy of the SPD.  In a cover letter,

Schueneman wrote, "[Mr. Woerner] appears not to have satisfied the active work requirement[.]"

[Id., Document 14].  On May 21, CIGNA officially denied Mrs. Woerner's claim for benefits.

In a letter addressed to her [Id., Document 15], CIGNA asserted that Mrs. Woerner could not get

benefits because she "already received payment" under another life insurance plan, and because

this ERISA plan "never became effective, because [Mr. Woerner] was never actively at work[.]"

On June 7, CIGNA reiterated its decision to Mrs. Woerner.  [Id., Document 16].

6

Documents that post-date Mr. Woerner's death are also part of the record.  On September

10, 2012, FRAM signed a "wrap-around document" entitled, "FRAM Group Operations, LLC,

Group Benefits Plan (Effective January 1, 2012)."  [Docket Entry 76, Pages 12-32].  The

document provides that it is not meant to govern benefit decisions, and that such decisions were

instead governed by individual policies.  FRAM also presents an undated document defining the

ERISA plan for "UCI International/FRAM Group."  [Id., Page 32, 42].  It lists a policy number

"FLX-964429" and an effective date of January 1, 2012.  The document states that an employee

is on active service if regularly at work.  [Id., Page 57].  It further outlines an appeals procedure

for denied claims.  [Docket Entry 76, Page 62].  Mrs. Woerner did not administratively appeal

the denial of benefits.

### B. Procedural History

Plaintiff filed suit against FRAM and Mr. Schueneman in October of 2012.  In April of

2014, this Court entered a stipulation among the parties in which Plaintiff dismissed her claims

against Schueneman, and in which FRAM consented to Plaintiff filing an Amended Complaint.

In September of 2014, Plaintiff filed her First Amended Complaint.  It states a single

count for benefits pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security

Act ("ERISA").  Plaintiff seeks judgment in the form of an award of life insurance benefits, as

well as attorneys' fees and costs.

Plaintiff moved for summary judgment on September 6, 2014.  In support of her motion,

Plaintiff argues that she should be awarded life insurance benefits based on the terms that were

actually disclosed to her and Mr. Woerner by the time of his death -- when their benefits vested -

- which never included a requirement that Mr. Woerner be actively at work.  Plaintiff urges that

such a requirement is unenforceable because it was retroactively added and because it constitutes a "secret exclusion."

Defendant opposes the motion and cross-moves for summary judgment in its favor. Defendant argues that Plaintiff is not entitled to benefits because Mr. Woerner did not satisfy the active-service requirement, which it describes as valid and enforceable. Defendant further contends that Plaintiff would not be entitled to benefits even if there were no active-service requirement, as that was not the only reason that CIGNA denied her benefits. Finally, Defendant asserts that Plaintiff has not exhausted her administrative remedies, and that in any event, FRAM is not a proper defendant under the circumstances.

Other procedural matters are now pending before the Court. Defendant has moved to strike paragraph three of Plaintiff's Amended Complaint; Plaintiff does not object. Additionally, Defendant has moved to compel the joinder of CIGNA, the fiduciary for its life insurance plan [Docket Entry 92]. The Court will dismiss these secondary matters as moot.

## II.   DISCUSSION

### A.  Legal Standard

The parties agree that this case is ripe for summary judgment. Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded predecessor to the current summary judgment standard). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a

district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  The court may not make credibility determinations or engage in any weighing of the evidence.  Anderson, 477 U.S. at 255.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial.  On claims for which the moving party does not bear the burden of proof at trial, the movant must point out to the district court "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  In contrast, "[w]hen the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; see also Schoch

v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported

allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B.  Plaintiff's ERISA Claim

The Court begins with the observation that both parties in this case believe that an ERISA

life insurance plan existed as of January 1, 2012.  The Court had -- in consideration of the fact

that no formalized ERISA plan documents were produced by that date -- asked the parties to

submit supplemental briefing on what should happen if no ERISA plan was effective at that time.

The parties responded by urging that an ERISA plan did exist, and that a contrary finding would

be erroneous.  In light of the parties' adamant consensus on this point, the Court will assume for

purposes of summary judgment that an ERISA plan existed as of January 1, 2012.

The analysis thus turns to what terms constituted that ERISA plan.   Plaintiff's claim for

benefits must be assessed against the provisions of an applicable ERISA plan, and the Court

must determine whether an active-service requirement was among those terms.  See 29 U.S.C. §

1132 ("A civil action may be brought . . . to recover benefits due to [the beneficiary] under the

terms of his plan[.]") (emphasis added).  Defendant views the formal documents executed after

Mr. Woerner's death as the governing ERISA plan; such documents include an active-service

requirement.  Plaintiff counters that those papers were never disclosed to the Woerners, and that

therefore the Court must look to documents actually provided to enrollees.

Having considered the parties' positions, the Court will rule in Defendant's favor.

Plaintiff's central argument -- that the Court can look only to terms that were disclosed to the

Woerners -- carries weight in terms of fairness and common sense.  The critical problem

undermining that argument, however, is that the Woerners only received a handful of sparse

emails and nonspecific attachments, none of which can be read to establish an ERISA plan.

Specifically, Plaintiff highlights five documents that were communicated by FRAM: (1) an October 21, 2011 email entitled "Benefits Update for FRAM Group Employees," which noted that life insurance would be among the benefits provided, but which stated that "plan options and details" would be communicated in the future; (2) the October 28, 2011 "Benefits Update" email, which gave a "brief overview" of the various plans in concise slides, but which failed to give specific plan information or terms; (3) a November 4, 2011 frequently asked questions email, which stated that enrollment information would be sent "in the coming weeks"; (4) a December 5, 2011 letter attachment, which detailed enrollment information, but which did not contain benefit or eligibility information; and (5) a December 7, 2011 "Confirmation for Employee Open Enrollment" email that described Mr. Woerner as enrolled in life insurance plans, provided the amount of coverage under those plans, and designated Plaintiff as the beneficiary, but which did not establish any substantive provisions setting forth an ERISA insurance plan.

None of these documents, either separately or in tandem, satisfy the "[r]equisite features" of an ERISA plan as set forth by 29 U.S.C. § 1102(b). Specifically, these documents fail to

> (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter, (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan (including any procedure described in section 1105(c)(1) of this title), (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and (4) specify the basis on which payments are made to and from the plan.
>
> [Id. (providing that "[e]very employee benefit plan shall" have those features) (emphasis added)].

To be sure, the Court does not suggest that an ERISA plan can never be found by examining an informal document, or by piecing together multiple documents that were not

11

intended to be final.   Instead, the Court finds that the particular documents cited by Plaintiff in

this case are simply too unsubstantial to constitute an ERISA plan; they merely refer to one.

That fact distinguishes this case from those relied upon by Plaintiff.  For example,

Plaintiff cites heavily to Bartlett v. Martin Marietta Operations Support, Inc., 38 F.3d 514, 516

(10th Cir. 1994).  There, the Tenth Circuit held that in the absence of a formalized ERISA plan

document, a flex benefit workbook given to employees would be treated as the plan.  However,

there is a significant difference between the handful of emails found here and the workbook

distributed in Bartlett, as the latter specifically included a section entitled, "Who is eligible?" and

proceeded to define who qualified as a regular, full-time employee that could receive coverage.

Plaintiff similarly emphasizes Gould v. GTE North Inc., 40 F. Supp.2d 434, 440 (W.D. Mich.

1999), vacated due to settlement, 68 F. Supp.2d 842 (W.D. Mich. 1999), in which a District

Court treated a "Benefits Highlights" booklet as an official plan document.  Yet unlike the few

pages of emails here that lacked specific eligibility information, that booklet was fifteen pages

long and "clearly advised plaintiffs that they were eligible [for coverage] without qualification."

Id. at 443.  In short, Plaintiff has not provided the Court with any binding authority which would

support treating the emails and attachments here as an ERISA life insurance plan.

The Court having found that the emails sent to Mr. Woerner fall short of creating an

ERISA life insurance plan, and the parties having stipulated that such a plan did exist, the Court

is forced to rely upon the only document that does establish a substantive ERISA plan and define

employees' eligibility:  the CIGNA-created "FRAM Life Insurance Plan," which has a policy

number FLX-964429.  (Docket Entry 76, Ex. 2, Page 42).  The FRAM Life Insurance Plan has a

stated effective date of January 1, 2012, and it reads in relevant part as follows:

> Coverage will not become effective for an Employee, his or her
> eligible Spouse or Dependent Child if an Employee is not actively

at work, due to Injury or Sickness, on the date his or her coverage would otherwise become effective under this policy. Coverage will become effective on the date the Employee returns to Active Service.

[Id. at Page 51].

The document goes on to define "Active Service" as either performing regular duties full-time, or being out on a permitted holiday or other leave. Id. at 57. Due to his illness, Mr. Woerner was not working on January 1, 2012, and he did not resume working before his death. Plaintiff's sole claim for benefits under ERISA must therefore be denied under the express ineligibility terms of the only ERISA plan document available.[1]

The Court acknowledges that this document -- finalized after Mr. Woerner's death -- was not provided to the Woerners. Although the Court holds in Defendant's favor, it does not endorse the dilatory practices elucidated in this litigation. Specifically, the Court finds fault with the sluggish manner in which Defendant and its insurer, CIGNA, finalized plan documents and distributed them to employees. Failing to disclose ineligibility terms to employees up-front undermines one of ERISA's central goals, which is to ensure that employees know their benefits

---

[1] When Plaintiff filed her Amended Complaint, she removed a claim for relief under ERISA Equitable Estoppel, see, e.g., Pell v. E.I. DuPont de Nemours & Co. Inc., 539 F.3d 292, 300 (3d Cir. 2008), which had been included in the initial complaint. [See Docket Entry 96, Page 17 (Plaintiff acknowledging that "[t]he First Amended Complaint does not contain an affirmative claim for relief based on ERISA equitable estoppel.")]. Accordingly, Plaintiff conceded Defendant's subsequent motion to strike the Amended Complaint's general prayer for equitable relief. In her most recent submission to this Court, however, Plaintiff mentions theories of common law equitable estoppel as it relates to Defendant's position on the existence of an ERISA plan. For completion, the Court simply notes that Plaintiff has made no demonstration of detrimental reliance on Defendant's representations, particularly because that would likely require proving that the Woerners would have been able to buy an additional life insurance policy had they known that Mr. Woerner was ineligible for FRAM's ERISA plan. The Court further notes that Plaintiff has also not demonstrated the kind of extraordinary circumstances that would justify equitable relief, particularly because Plaintiff did indeed receive a payment of $297,000 under Mr. Woerner's Basic Group Term Life Insurance [see Docket Entry 81, Document 1, Page 26], a plan separate from the one discussed here.

through written plans.  See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995)

(holding that ERISA "is built around reliance on the face of written plan documents" and

observing that Congress sought to allow "every employee . . . on examining the plan documents,

[to] determine exactly what his rights and obligations are under the plan.") (internal citation and

quotation marks omitted); In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896, 902

(3d Cir. 1995); Hozier v. Midwest Fasteners, 908 F.2d 1155, 1168 (3d Cir. 1990).

        Nevertheless, the official ERISA plan documents that Defendant and CIGNA did

eventually execute are the only terms that this Court has as a basis for a ruling.  Additionally, as

Defendant notes, there is some authority to suggest that the failure to notify employees about

plan terms may not necessarily be dispositive of those terms' enforceability.  See Henglein v.

Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 401 (3d Cir.

1992) (addressing standard for finding plan in absence of formal documents, and noting that

"ERISA does not require that a beneficiary have any knowledge of a written plan's terms, and

our federal jurisprudence has not imposed that requirement either.").  Regulations that govern

ERISA plan implementation, moreover, provide 120 days to provide beneficiaries with a SPD

for new plans.  See 29 C.F.R. § 2520.104b-2(a)(2).  It appears that Defendant's distribution took

place within this time period, and even had it not, additional authority suggests that disclosure

violations do not necessarily entitle a party to benefits.  See Hozier v. Midwest Fasteners, 908

F.2d 1155, 1167 (3d Cir. 1990) (rejecting plaintiffs' contention "that defendants' reporting and

disclosure violations are [] relevant in evaluating their entitlement to benefits under the terms of

[an] unamended [] plan.").   All told, for the foregoing reasons, Plaintiff is not entitled to benefits

under the plan as construed by the Court.  The Court will accordingly grant summary judgment

for Defendant.[2]

### III.    CONCLUSION

For the reasons above, the Court finds that Defendant is entitled to summary judgment.

An appropriate Order will be filed.

<u>    s/ Stanley R. Chesler    </u><br>
STANLEY R. CHESLER<br>
United States District Judge

Dated: June 30, 2015

---

[2] Because of this Court's decision, it need not reach the parties' disputes regarding administrative exhaustion, double-dipping, or whether CIGNA is a required party.

15